**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| | ) | **Case No. 14-_____** |
| **ODOM INDUSTRIES, INC.,** | ) | |
| | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |

**DECLARATION OF TIMOTHY C. ODOM IN SUPPORT OF**
**FIRST-DAY MOTIONS AND APPLICATIONS**

I, Timothy C. Odom, hereby declare as follows:

1.      I am the Chief Executive Officer and sole shareholder of Odom Industries, Inc. (the "**Debtor**"), an Ohio corporation.  In my capacity as Chief Executive Officer and sole shareholder, I am familiar with the day-to-day operations, business affairs, books and records of the Debtor.  I am authorized by the Debtor to submit this Declaration.

2.      I submit this Declaration in support of the Debtor's voluntary petition for reorganization under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") and first day motions and applications filed concurrently herewith on June 5, 2014 (the "**Petition Date**").  Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge, my review of the relevant documents, and/or my opinion based upon personal experience and knowledge of the Debtor's business and its financial condition.  If called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

3.      Part I of this Declaration describes the business of the Debtor and the developments which led to the Debtor's filing of this chapter 11 bankruptcy case.  Part II sets forth the relevant facts in support of the various first day motions ("**First Day Motions**") and

applications ("**Applications**") filed by the Debtor concurrently herewith. I am familiar with the first-day motions and applications filed by the Debtor.

## I.    BACKGROUND

**Corporate History and Structure**

4.    The Debtor is an Ohio corporation reorganized in 2003 from a limited liability company, which was organized in 2001, and it became an s-corporation. The Debtor is derived from the purchase of the business assets of RK Fabricating, formerly known as Stacey Manufacturing. The Debtor operates in a facility located at 1262 U.S. Highway 50, Milford, Ohio, which is property leased from Odom Real Estate, LLC, an affiliated, non-debtor entity.

5.    The Debtor is a provider and creator of parts and equipment for industries such as, among others, steel, petrochemical, food processing, structural fabricating, construction and mining, and employs a team comprised of numerous highly trained employees that are able to meet the diverse needs of customers in these varying industries. The Debtor's business operations focus on designing and fabricating services, which enable the Debtor to create metal structures, such as, among others, pressure vessels, tanks, stacks, drums, domes, headers, columns and generators. These services allow the Debtor to provide customers with both standard industry designs and creations and extensive custom fabricating for forming a wide variety of structural shapes. In addition, the Debtor provides through outsourcing a variety of refractory lining, post-welding heat treatment and internal/external coating services, which allows for the Debtor's customers to receive a broad range of services that extend beyond the development, creation and fabrication of metal products.

6.    The Debtor is the obligor on various notes and leases, primarily secured by the Debtor's assets, including, but not limited to, the Debtor's equipment. The Debtor's primary

financing and debt obligations are with Fifth Third Bank, which, as of the Petition Date, is owed

approximately, $811,693.54.  This amount is comprised of debts due and owing to Fifth Third

Bank pursuant to that certain Term Note dated June 30, 2010 and certain credit card obligations.

The obligations owed to Fifth Third Bank are secured by substantially all of the Debtor's assets,

including, but not limited to, the Debtor's accounts, equipment, inventory, general intangibles,

investment property, instruments, chattel paper, documents, cash, letters of credit, promissory

notes, warrants, dividends, distributions, and contracts, except as otherwise described herein.

7.      In addition to the above stated Fifth Third Bank obligations, the Debtor is the

obligor on equipment notes and leases with other entities such as, but not limited to, U.S. Bank,

National Association, Ally Financial, Inc., Stearns Bank, N.A., and First National Bank of

Carrollton.

**Events Leading to Chapter 11**

8.      Over the past several years, dating back to 2007, at various times the Debtor has

experienced a series of customer delays, "short pay" customers, vendor failures and below

average sales figures that, when combined, have had a crippling effect on the Debtor's business

operations.  For example, in 2007, 2008, and 2010, the Debtor was engaged by separate entities

to complete various fabrication projects in the amount of $2,000,000.00, $7,000,000.00 and

$8,000,000.00.  Notwithstanding agreements to the contrary, the Debtor's customers on each of

these large fabrication projects delayed progress for a multitude of reasons and/or "short paid"

the Debtor for work completed.

9.      As a result of these fabrication project issues and general market conditions, the

Debtor defaulted on its obligations to Fifth Third Bank.  In order to continue its business

operations, the Debtor reached an aggressive work-out agreement with Fifth Third Bank that

included Fifth Third withdrawing the Debtor's revolving line of credit, leaving it with extremely high performance expectations and little margin for losses.  Yet, the Debtor met this aggressive payment schedule and reduced its debt owed to Fifth Third Bank by approximately $1.3 million, despite not having a line of credit.

10.     The Debtor weathered the storm of customer delays, vendor underperformance and "short pays" through an aggressive sales approach that exceeded goals each year until 2013. In 2013, for the first time in the Debtor's history, actual sales were below sales projections for the year, and in 2014, the Debtor anticipates sales figures to be even lower.  Given these bleak sales projections, there are insufficient new projects in the Debtor's pipeline to provide it with the going forward cash flow requirements for its existing financial obligations and current and future customer needs.

11.     This situation has left the Debtor with no choice but to market its business for sale.  Over the past few months, the Debtor has actively marketed its business for a potential sale.  As a result of these marketing efforts, Hason USA Corp. ("**Hason**") and the Debtor have entered into a proposed Asset Purchase Agreement ("**APA**") through which Hason would provide debtor-in-possession financing to the Debtor to continue to operate through this chapter 11 case and the closing of a sale of the Debtor's business through a Court-approved, competitive section 363 sale process.

12.     It is my opinion that the commencement of this chapter 11 bankruptcy case is necessary and in the best interest of all of the Debtor's creditors, and that a sale to Hason through a section 363 competitive bidding process as proposed herein will provide the Debtor's estate with the maximum possible value for the benefit of all affected parties.

## II.    FIRST DAY MOTIONS AND APPLICATIONS

13.    I have reviewed each of the First Day Motions, and I believe that the relief sought in the First Day Motions is critical and necessary to the Debtor's efforts to be successful in this chapter 11 case and to maximize the value of the Debtor's assets for the benefit of its creditors and its estate.  An overview of and support for each of the Debtor's First Day Motions is below.

### A.    Emergency Motion of Debtor for Entry of an Order (A) Scheduling an Expedited Hearing on First Day Motions and Application Filed by the Debtor and (B) Approving the Form and Manner of Notice Thereof ("Expedited Hearing Motion")

14.    The Debtor requests entry of an order, among other things, convening expedited hearings on certain First Day Motions and approving the form and manner of notice thereof.

15.    I believe that the First Day Motions involve matters that require emergency and expedited hearings.  As set forth in detail in each of the First Day Motions, the relief requested in the First Day Motions is essential to the continued operation of the Debtor's business, the preservation of the value of the Debtor's chapter 11 estate, assists in ensuring that the Debtor satisfies its current obligations, and assists in the administration of this chapter 11 case in an efficient manner.  The First Day Motions are of the type heard on an emergency or expedited basis, and any delay in authorizing the relief therein could have a severe and irreparable effect on the Debtor's operations, its transition into chapter 11 and the proposed section 363 sale process.  Accordingly, the Debtor requests a hearing on each of the First Day Motions on an expedited basis.

16.    Although the Debtor seeks the scheduling of a hearing on the First Day Motions as soon as practical after the Petition Date, and therefore, without notice, prior to or immediately upon the filing of its chapter 11 petition the Debtor provided electronic or hard copies, via overnight mail, postage prepaid, of the First Day Motions to (i) the Office of the United States

Trustee for the Southern District of Ohio; (ii) counsel to Fifth Third Bank, Inc.; (iii) counsel to

Hason USA Corp.; (iv) creditors listed on the Debtor's list of twenty largest unsecured creditors;

(v) creditors asserting a security interest in the assets of the Debtor to the extent reasonably

known to the Debtor; (vi) all parties to equipment leases with the Debtor to the extent reasonably

known to the Debtor; (vii) Milford Tax Department; (viii) Clermont County Treasurer; (ix)

Clermont County Auditor; (x) Ohio Department of Taxation; (xi) Ohio Commercial Activity Tax

Division; (xii) Ohio Department of Job and Family Services; (xiii) Ohio Bureau of Workers'

Compensation; (xiv) Department of Treasury, Internal Revenue Service; (xv) Kentucky

Department of Revenue; (xvi) Indiana Department of Revenue; (xvii) counsel to any party in

pending litigation with the Debtor; (xviii) those entities specifically affected by a specific

motion; (xix) the Debtor; and (xx) counsel to the Debtor.

17.     Accordingly, I believe that the First Day Motions involve matters that require an

expedited hearing and respectfully request that this Court schedule such hearing as requested in

the Expedited Hearing Motion.

**B.      Emergency Motion of the Debtor for an Order (I) Authorizing, but not Directing, the Debtor to (A) Pay and Honor Certain Prepetition Claims for Wages, Salaries, Bonuses and Other Compensation; (B) Continue Employee Benefit Programs in the Ordinary Course of Business; and (C) Pay Certain Reimbursable Expenses; (II) Authorizing, but not Directing, the Debtor to Make Deductions from Employee Paychecks; and (III) Authorizing and Directing Banks and Other Financial Institutions to Receive, Process, Honor and Pay All Checks and Electronic Payment Requests Made by the Debtor Relating to the Foregoing (the "Employee Obligations Motion")**

**(I)      Employee Obligations**

**(i)      Unpaid Compensation**

19.     The Debtor pays employees approximately 26 employees (the "**Employees**"), of

whom approximately 9 are salaried and 17 are hourly employees, on a bi-weekly basis (the "**Pay**

**Period**"), which runs from Saturday to Sunday, and is paid on the Friday following the end of the Pay Period.  The Debtor's average gross compensation for Employees during a pay period is approximately $105,000.00.  The payroll is made primarily by check.

20.     As of the Petition Date, the Debtor has not paid its Employees all prepetition wages and compensation may be due and owing as of the Petition Date because, among other things, there may have been variations in the Debtor's payroll records and the Employees checks may not have cleared financial institutions.

21.     The Debtor is seeking authority to pay amounts owed to Employees and is estimating that, as of the Petition Date, approximately $52,500.00 will be outstanding, which consists of accrued wages, salaries, overtime pay and other compensation earned prior to the Petition Date.

22.     As set forth in the Employee Obligation Motion, I believe that the Debtor must have authority to pay or otherwise satisfy the amounts owing to Employees for wages.  The relief requested in the Employee Obligations Motion is crucial because the employees are vital to the continued operation of the Debtor's business and is necessary because of the potential damage to the Debtor's chapter 11 estate that could result from non-payment of Employees.  The amounts to be paid to or for the benefit of the employee are reasonable, considering their importance and necessity to the Debtor's business.

**(ii)     Remitting and Paying Appropriate Deductions and Withholdings**

23.     The Debtor deducts certain amounts from Employee paychecks, including, without limitation, (a) garnishments, child support, and similar deductions, (b) other pre-tax and after-tax deductions payable pursuant to certain employee Benefits discussed herein (such as an Employee's share of health care Benefits, insurance premiums, 401(k) contributions, legally

ordered deductions and other miscellaneous deductions), as well as (c) deductions for individual insurance programs selected by the Employees such as voluntary life insurance (collectively, the "Deductions").

24.    On average, each month, the Deductions total approximately $33,000.00 for Employees. However, due to the commencement of this chapter 11 case, some of these Deductions may not have been deducted from the Employees' earnings and/or forwarded to the appropriate third-party recipients prior to the Petition Date. Accordingly, the Debtor seeks authority to continue to forward these prepetition Deductions (which are held in trust) to applicable third party recipients on a postpetition basis, in the ordinary course of business, as routinely done prior to the Petition Date.

25.    Further, the Debtor is required by law to withhold from its Employees' wages amounts related to federal, state, and local taxing authorities, (the "**Withheld Amounts**"). On average, the Withheld Amounts total approximately $33,000.00 per month for Employees.  The Debtor must also match from its own funds for social security and Medicare taxes and pay, based on a percentage of gross payroll, and additional amounts for state and federal unemployment insurance (the "**Employer Payroll Taxes**"). The Employer Payroll Taxes, together with the Withheld Amounts, are referred to collectively hereafter as the "**Payroll Taxes**."

26.    Prior to the Commencement Date, the Debtor withheld the appropriate amounts from Employees' earnings for the Withheld Amounts and reserved for the Employer Payroll Taxes.  However, due to this chapter 11 filing, the Payroll Taxes may not have been forwarded to the appropriate taxing authority. As a result, the Debtor seeks authority, at its discretion, to continue to honor and process the prepetition obligations with respect to the Payroll Taxes on a postpetition basis, in the ordinary course of business, as routinely done prior to the Petition Date.

8

### (iii)    Honoring Reimbursable Expenses

27.     Prior to the Petition Date, and in the ordinary course of business, employees incurred certain expenses on the Debtor's behalf, which include but are not limited to, meals, parking, automobile mileage and other business related expenses (the "**Reimbursable Expenses**"). Employees use their personal funds to pay for the Reimbursable Expenses, and submit check requests to their supervisor who reviews and approves the requests and then forwards them to accounting for payment from corporate funds. Reimbursable Expenses average approximately $2,000.00 per month.

28.     To the extent any Employees incurred the Reimbursable Expenses, such expenses were incurred on the Debtor's behalf and in the scope of their employment, with the understanding that such expenses would be paid by the Debtor. Accordingly, the Debtor requests authority, in its sole discretion, to (a) continue reimbursing the Reimbursable Expenses in accordance with prepetition practices, (b) modify its prepetition policies relating thereto, and (c) pay all Reimbursable Expenses that relate to the prepetition period.

### (II)    Employee Benefits

29.     The Debtor provides Employees, in the ordinary course of business, with a number of Employee Benefits designed to assist the Employees and the Employees' eligible dependents. These Employee Benefits include, but are not limited to: (a) medical, dental and vision insurance; (b) workers' compensation insurance; (c) vacation time and other paid absences; (d) 401(k) plan; and (e) other miscellaneous benefits. The Debtor seeks authorization, but not discretion, to pay or otherwise continue to honor these Employee Benefits, as described herein.

### (i)    Health Benefits

30.     The Debtor provides certain Employee who qualify with medical, dental and vision insurance.  The medical insurance is provided by Anthem (the "**Medical Plan**"), and on a monthly basis, the Debtor, with contributions from the Employees, funds the Medical Plan.  The dental insurance is provided by Anthem (the "**Dental Plan**"), and on a monthly basis, the Debtor, with contributions from the Employees, funds the Dental Plan.  The vision insurance is provided by Humana (the "**Vision Plan**"), and on a monthly basis, the Debtor with contributions from the Employees, funds the Vision Plan.  Together, the Medical Plan, the Dental Plan, and the Vision Plan are the "**Health Benefits**."

31.     The average monthly cost of the Health Benefits is $14,650.00 per month, which consists of employee contributions, employer contributions (only for the Medical Plan) and certain administrative expenses related thereto.

32.     In an abundance of caution, in the event any accrued but unpaid prepetition liabilities pertaining to the Health Benefits exist, the Debtor seeks Court approval to pay said amounts owed in the ordinary course of business.  Further, there may be Health Benefit payments that have not yet cleared the bank and the Debtor requests that such payments be honored in the ordinary course of business.  Employees rely on the Debtor to provide continuing health care benefits.  In the event the relief requested is not honored, the Employee welfare, morale and expectations would be significantly harmed.

33.     Furthermore, and for similar reasons, the Debtor seeks to continue to provide continuation coverage under section 4980B of the Internal Revenue Code to administer Continuation Health Coverage ("**COBRA**") (see 26 U.S.C. § 4980B).  The premiums for the COBRA coverage are paid by the Debtor.  The Debtor pays approximately $1,200.00 per year to

Chard Snyder to administer the COBRA Coverage.  On a monthly basis, the Debtor collects approximately $1,200.00 from Qualified Cobra Beneficiaries.

34.     By this Motion, the Debtor seeks authority, in its sole discretion to: (a) continue the Medical Plan for its Employees in the ordinary course of business; (b) continue making contributions to the Medical Plan; (c) pay any amounts related to the Medical Plan and the Employee Benefits, including any premiums, claim amounts and administrative fees, to the extent that such amounts remain unpaid on the Commencement Date; and (d) pay its COBRA obligations.

### (ii)     Workers' Compensation

35.     Pursuant to applicable state laws, the Debtor must maintain workers' compensation liability coverage (the "**Workers' Compensation Programs**") in the ordinary course of business to ensure prompt and efficient payment and/or reimbursement to their Employees for workers' compensation claims.

36.     Ohio law requires that employers obtain workers' compensation coverage through the state fund (the "**State Fund**") administered by the Bureau of Workers' Compensation ("**BWC**") or have the BWC grant the employer the privilege of self-insurance for liabilities associated with work related accidents or occupational diseases.  The Debtor has had self-insured status in Ohio since 2000.  The Debtor uses a third-party administrator, Sheakley UniService, Inc., to administer claims.  The Debtor pays annual fees and claims, as they are incurred, to the BWC. The Debtor's annual costs associated with maintaining its Workers' Compensation Program and self-insured status (both in annual fees and claims as they are incurred) amounts to an annual average of approximately $60,000.00.

37.    By the Employee Obligations Motion, the Debtor requests authority to continue to maintain its Workers' Compensation Program in the ordinary course of business and pay any prepetition amounts related thereto.

### (iii)    Vacation, Holiday and Paid Leave

38.    Vacation Time.  Full-time Employees earn vacation based upon time served with the Debtor as an Employee:  (i) after one year of employment, Employee receives one (1) week paid vacation; (ii) after two years of employment, Employee receives two (2) weeks paid vacation; and (iii) after five years of employment, Employee receives two (2) weeks paid vacation and five (5) days of personal leave.  Any vacation time not utilized within one (1) year of the date earned is forfeited by the Employee.

39.    Holiday Pay. The Debtor provides regular full time Employees eight (8) paid holidays ("**Holiday Pay**") per year. If a holiday falls on a weekend, Employees receive either the Friday before or the Monday following the holiday as an additional paid vacation day.  Holiday Pay is paid at an Employees regular rate.

40.    Special Leave. The Debtor provides regular full time Employees, who are called for jury duty, with pay for serving as a jury member ("**Jury Duty Leave**").  Jury Duty Leave is intended to make up the difference between any lesser amount a participating Employee receives as a jury member and the Employee's regular earnings.  The Debtor provides regular full time Employees, who are absent from work following the death of a eligible family member, with pay in an amount commensurate with their regular rate ("**Bereavement Leave**," together with Jury Duty Leave, the "**Special Leave**").

41.    By the Employee Obligations Motion, the Debtor seeks Court approval to, among other things, (i) continue to permit Employees to accrue and use Special Leave days in the

12

ordinary course of business, without disruption, (ii) permit the Debtor to continue to honor

vacation time in the ordinary course of business, and (iii) permit the Debtor to honor and pay any

obligations related to Special Leave.

### (iv)   401(K) Savings Plan

42.    The Debtor sponsors a 401(k) Plan for the Employees that is administered by

TransAmerica Retirement Solutions.  Substantially all of the Debtor's Employees are eligible to

participate in the 401(k) Plan.  The Employees' contributions to the 401(k) Savings Plan total

approximately $365.00 per Pay Period.  Current the Debtor estimates that there is approximate

$1,650.00 of accrued but unpaid prepetition liabilities pertaining to the Employees' contributions

to the 401(k) Savings Plan.

43.    By this Employee Obligations Motion, the Debtor requests to continue the 401(k)

Plan for Employees, in its sole discretion, and in the ordinary course of business and to remit and

contribute any prepetition amounts withheld thereunder.

### (v)   Employee Insurance Benefits

### (a)   Basic Life Insurance, Supplemental Life Insurance, and Short and Long Term Disability Benefit Program

44.    The Debtor provides basic group term life insurance coverage ("**Basic Life Insurance**") to all full-time Employees through Anthem.  All costs of the Basic Life Insurance

are borne exclusively by the Debtor and the average aggregate annual cost to Employees

amounts to approximately $0.00.

45.    Full-time Employees are also eligible to purchase supplemental life insurance (the

"**Supplemental Life Insurance**", and, collectively with the Basic Life Insurance the "**Life**

**Insurance**"), for which the Employees pay all the premiums.  Some full-time employees have

selected to participate in the Supplemental Life Insurance program through Anthem.  All costs of

the Supplemental Life Insurance are borne exclusively by the Employee participants; however, these payments are made through payroll deductions, with the Debtor remitting the amounts owed directly to Anthem.   Consequently, there may be accrued and outstanding amounts withheld from the Employees that have not yet been paid to Anthem.   The average aggregate annual cost to Employees amounts to approximately $2,400.00.

46.      The Debtor provides certain Employees with short-term disability benefits (the "**Short-Term Disability Benefits**").   Short-Term Disability Benefits are administered and insured through Anthem.  Certain Employees are eligible to receive up to twenty-six (26) weeks of paid leave equivalent to 60% of each particular Employee's regular rates for approved disabilities with appropriate documentation from a physician or other health care provider.   The average monthly cost to the Debtor for the Short-Term Disability Benefits is included in the costs and premiums associated with the Medical Plan.

47.      Full time Employees are also eligible to purchase long-term disability benefits (the "**Long-Term Disability Benefits**," and together with the Life Insurance and the Short-Term Disability Benefits, the "**Employee Insurance Benefits**").   Long-Term Disability Benefits are administered and insured through Anthem and provide Employees with up to 60% of their income for approved disabilities. The participating Employees each pay 0% of the premiums for Long-Term Disability Benefits.   The Debtor deducts approximately $0.00 from the Employees' wages for Long-Term Disability Benefits per month.

48.      The Debtor believes that approximately $0.00 is owing under the Employee Insurance Benefits as of the Petition Date in the aggregate.

49.      By this Motion, the Debtor seeks, out of an abundance of caution, authority, in its discretion, to (a) continue to provide the Employee Insurance Benefits, including payment of

third-party administrators' fees, (b) modify its prepetition policies relating thereto, as it deems appropriate, without approval of this Court, (c) to pay any amounts relating thereto that (i) accrued prepetition and (ii) accrued postpetition but relate to the prepetition period and (d) to remit any prepetition amounts withheld thereunder.

**(III)   Direction to Banks**

50.    Finally, the Debtor seeks an Order authorizing and directing all banks to receive, process, honor and pay any checks, direct deposits, and/or wire transfers drawn upon the Debtor's payroll and general disbursement accounts related to Employee Wage and Benefits, whether presented before or after the Petition Date, provided that such funds are on deposit in the applicable amounts to cover such payments.

**C.   Emergency Motion of the Debtor for Entry of an Order (I) Approving Continued Use of Existing Cash Management System, (II) Authorizing Use of Prepetition Bank Accounts and Business Forms, (III) Waiving Certain Requirements of the United States Trustee, and (IV) Waiving the Requirements of 11 U.S.C. § 345(B) (the "Cash Management Motion")**

56.    By the above-captioned Cash Management Motion, the Debtor seeks entry of an order:  (a) authorizing the continued use of the Debtor's existing centralized cash management system (the "**Cash Management System**") and (b) authorizing maintenance of the Debtor's existing checks, bank accounts, and business forms.  The Debtor seeks authorization to insure its orderly entry into bankruptcy and to help efficiently administer its business and avoid the disruptions and distractions that would inevitably divert the Debtor's attention from urgent matters during the initial stages of its chapter 11 bankruptcy case.

**(i)   The Cash Management System**

57.    The Debtor maintains eight (8) bank accounts (the "**Bank Accounts**"), consisting of seven (7) at Fifth Third Bank, Inc. ("**Fifth Third Bank**") and two (2) at Central Bank & Trust

Co. ("**CBT**," together with Fifth Third Bank, the "**Banks**") in the ordinary course of business. The Bank Accounts include, without limitation, depository accounts, payroll accounts, and accounts payable accounts. A true and correct list of the Bank Accounts, including the Banks, each Bank's address and the last four digits of the account numbers is attached to the Cash Management Motion as <u>Exhibit A</u>.

58.     The Cash Management System provides well-established mechanisms for the collection, distribution, and management of funds used in the Debtor's business. The flow of cash begins with cash generated at its Milford plant.  The Debtor's cash management reporting and accounting functions are systematic and include the necessary accounting controls to enable the Debtor to trace funds. The Debtor maintains necessary records for its Cash Management System that identify the current balance of its Bank Accounts. The Debtor will also be able to determine the amount of funds deposited into or withdrawn from the Bank Account by the Debtor and will track the expenses that are satisfied.

59.     Accordingly, I believe the ability to maintain the current Cash Management System is necessary to avoid disruption of the ongoing business operations and the relief as requested in the Cash Management Motion should be granted.

### (ii)     Existing Bank Accounts and Business Forms

60.     The Debtor seeks a waiver of the UST requirement that its Bank Accounts be closed and that new postpetition bank accounts be opened.  In particular, the Debtor requests that it be permitted to close the CBT Bank Account (as defined in the Cash Management Motion), consolidate the amounts contained in the CBT Bank Account into the Fifth Third Bank Account (as defined in the Cash Management Motion), and maintain and use only the Fifth Third Bank Account going forward.  The Fifth Third Bank Account serves as the Debtor's primary operating

accounts and is the central component of the Cash Management System.  The Debtor also requests that the Fifth Third Bank Account be deemed a debtor-in-possession account and the Debtor, in continuing to use said account, will have the Fifth Third Bank Account designated with Fifth Third Bank as a debtor-in-possession account.

61.     I believe it is critical to the continued operation of the Debtor's business and the preservation of the value of its assets that the existing Cash Management System and Bank Accounts, and in particular, the Bank Account with Fifth Third Bank, continue to be utilized without disruption.

62.     In addition, the Debtor's pre-printed correspondence, business forms, letterhead and checks are all customized according to its ordinary business needs.   Changing correspondence and business forms would be unnecessary and burdensome to the estate, as well as expensive and disruptive to the Debtor's business operations.  Parties doing business with the Debtor undoubtedly will be aware of the Debtor's status as debtor in possession and brand new correspondence and business forms would be unneeded.  Accordingly, the Debtor also requests authority to (i) continue using its correspondence and business forms to the extent that the Debtor shall manually alter and/or modify said forms with the debtor-in-possession designation and (ii) delay the purchase and/or obtaining of new correspondence and business forms with the debtor-in-possession designation until the existing correspondence and business forms have been completely used.

63.     Accordingly, I believe approval of the Cash Management Motion is in the best interest of the Debtor, its estate, and parties-in-interest.

**D.     Emergency Motion of the Debtor for Entry of an Order Under 11 U.S.C. §§ 105(a) and 366 (I) Prohibiting Utilities from Discontinuing, Altering or Refusing Service, (II) Establishing Procedures for Determining Adequate Assurance of Payment and (III) Establishing Procedures for Utilities to Opt**

## Out of Debtor's Proposed Procedures for Adequate Assurance ("Utilities Motion")

69.     In the operation of its business, the Debtor purchases utility services from various providers (the "**Utility Providers**") for, among other things, electricity, water, telephone, internet, and trash service in the ordinary course of business (the "**Utility Services**").  Attached as Exhibit A to the Utilities Motion is a nonexclusive list of substantially all of the Utility Companies that were providing Utility Services to the Debtor as of the Commencement Date.  Based on historical average over the last twelve months, the Debtor spends approximately $8,580.00 each month on utility costs.

70.     Uninterrupted utility services are essential to the Debtor's ongoing business operations and, therefore, to the success of its chapter 11 efforts.  Should the Utility Providers refuse or discontinue service to the Debtor, even for a brief period, the Debtor's business operations would be severely disrupted and/or damaged.

71.     Continuity of services is particularly critical in this case because the Debtor relies on various utilities, particularly, electricity and water, for continued operation at its facility.  Failure to maintain continuously operating facilities will inevitably harm fabrication operations.  Indeed, an interruption of utility services would negatively impact the Debtor's business operations, revenue, and profits, seriously jeopardizing the Debtor's chapter 11 efforts.  It is, therefore, critical that utility services continue uninterrupted.

72.     The Debtor fully intends to pay all postpetition obligations owed to the Utility Providers in a timely manner.  The Debtor expects that cash from its operations will be more than sufficient to pay the Debtor's postpetition obligations, including all postpetition utility obligations.

73.     Nevertheless, the Debtor intends to provide adequate assurance of payment for future services to its Utility Providers, the Debtor proposes to make a deposit of $4,290.00 (the "**Utility Deposit**"), representing a deposit equal to two weeks of utility service, into a newly created, segregated, interest-bearing account within 5 days of the Petition Date (the "**Utility Deposit Account**").  This amount is based on the historic average over the past 12 months, from each Utility Provider listed on the Utility Service List.

74.     The Debtor submits that the Utility Deposit, in conjunction with existing security deposits and the Debtor's ability to pay for future utility services in the ordinary course of business (collectively, the "**Proposed Adequate Assurance**"), constitutes sufficient adequate assurance to the Utility Providers.

75.     In light of the severe consequents to the Debtor of any interruption in Utility Services, but recognizing the right of Utility Providers to evaluate the Proposed Adequate Assurance on a case-by-case basis, the Debtor is proposing procedures in the Utilities Motion that will enable the Debtor to cooperatively work with the Utility Providers in a coordinated manner to consensually resolve adequate assurance issues.  If any Utility Provider believes additional assurance is required and any issues cannot be consensually resolved, they may request such assurance pursuant to the procedures set forth in the Utilities Motion.

76.     I believe the proposed Adequate Assurance and related procedures set forth in the Utilities Motion is sufficient to provide the Utility Providers with adequate assurance of payment. I further believe that the relief requested in the Utilities Motion and the proposed procedures set forth therein are necessary for the Debtor to carry out its efforts in this chapter 11 case.  If this Court does not approve the proposed procedures, the Debtor could be forced to address numerous requests by its Utility Providers in a disorganized manner at a critical point

during this chapter 11 case.  Moreover, discontinuation of service, particularly electricity, would essentially put an immediate halt to the Debtor's operations, putting the Debtor's efforts in this chapter 11 case in extreme jeopardy.

77.    Lastly, the Debtor has made an extensive and good faith effort to identify its Utility Providers and included them on the utility service list.  Nonetheless, it is possible that the Debtor has not yet identified or included certain Utility Providers on said service list.  To the extent that the Debtor identifies additional Utility Providers, the Debtor will file amendments to the Utility Service List, and shall serve copies of the Order on such newly identified Utility Providers.  The Debtor requests that the order be binding on all Utility Providers, regardless of when such Utility Provider was added to the utility service list.

78.    Accordingly, I believe that the relief requested in the Utilities Motion is in the best interests of the Debtor's estate, its creditors and other parties in interest.

**E.    Emergency Motion of the Debtor for Entry of an Order (A) Authorizing the Debtor to Remit and Pay Sales, Use, and Franchise Taxes and Certain Other Government Charges and (B) Approving Related Relief ("Tax Payments Motion")**

79.    Under the Tax Payments Motion, the Debtor seeks entry of an order pursuant to section 105 of the Bankruptcy Code that authorizing, but not requiring, the Debtor to remit and pay CAT, personal property and/or income taxes and such other taxes, as well as fees, licenses, and other similar charges and assessments as the Debtor, in its discretion, deems necessary or appropriate, to the appropriate taxing authorities (the "**Taxing Authorities**") in the ordinary course of business, on an unaccelerated basis, as payments become due and payable.  To the extent that a check issued prior to the Petition Date has not cleared the bank as of the Petition Date, the Debtor also seeks entry of a order (i) authorizing the Debtor's banks to honor such checks and/or any prepetition wire transfer requests and (ii) authorizing the Debtor to issue

20

replacement checks,  submit replacement fund transfer requests or provide other means of

payment to the Taxing Authorities to the extent necessary to pay all undisputed prepetition sales,

use and franchise tax obligations.

80.    In connection with the normal operation of business, the Debtor incurs CAT,

personal property, and income taxes, among other taxes, and fees (collectively, the "**Taxes**") on

behalf of various taxing authorities for payment to such authorities.  The Debtor pays the Taxes

to the various Taxing Authorities on a monthly, quarterly or yearly basis, depending on the

particular Tax, as such payments become due and payable.

81.    On a periodic basis, the Debtor pays to the Taxing Authorities all by funds drawn

by check or by means of an electronic funds transfer.

82.    As of the Commencement Date, the Debtor's financial records indicate that the

Debtor is current on some of its payment of Taxes, and delinquent on others, to the Taxing

Authorities.  A complete list of the Debtor's Taxing Authorities are attached as <u>Exhibit A</u> to the

Tax Motion.  Therefore, the Debtor seeks this relief out of an abundance of caution and to the

extent that any Taxes accrued prepetition were not paid prepetition, paid in an amount that is less

than actually owed, or if any payments sought to be made prepetition are rejected, lost or

otherwise not received in full by any Taxing Authority.

83.    I believe that the failure to pay the Taxes could have a material adverse impact on

the Debtor's ability to operate in the ordinary course of business and could result in the Debtor's

officers and directors being held personally and/or criminally liable for the failure to pay the

Taxes.  Furthermore, the Debtor believes that the Taxing Authorities may cause the Debtor to be

audited if certain of the Taxes are not paid, and such audits will unnecessarily divert the Debtor's

attention from its business operations and reorganization.  The payment of the Taxes is also

21

necessary to avoid potential administrative difficulties.  Withholding of payment of the Taxes will likely cause the Taxing Authorities to take immediate action, including an increase in state audits and lien filings or motions for relief from stay.  Prompt and regular payment of the Taxes will help avoid these unnecessary government actions.

84.    In addition, I am informed by counsel that the Taxes may be afforded priority status under section 507(a)(8) of the Bankruptcy Code, and therefore, such taxes and fees must be paid in full as a condition to confirmation of any plan of reorganization. Accordingly, the payment of the taxes and fees affects the timing of the payment and should not prejudice the rights of other creditors or reduce the ultimate distribution to such creditors. Further, to the extent that the Debtor has collected sales and use taxes from its customers and such funds must be held in trust by the Debtor for the benefit of the Taxing Authorities, such monies may not constitute property of the Debtor's estate.

85.    Accordingly, I respectfully submit that the payment of the taxes and fees is necessary for the continued operation of the Debtor's business.

**F.    Emergency Motion for Entry of Agreed Interim and Final Orders (I) Authorizing Debtor to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363 and 364; (II) Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. § 363; (III) Granting Liens and Superpriority Claims; (IV) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. § 361, 362, 363 and 364; and (V) Scheduling Final Hearing on the Debtor's Motion to Incur Such Financing on a Permanent Basis Pursuant to Bankruptcy Rule 4001 ("DIP Financing Motion")**

86.    Pursuant to the DIP Financing Motion, the Debtor seeks the authority to (i) obtain cash advances and other extensions of credit on a secured basis up to the aggregate principal amount of $552,000.00 (the "**DIP Facility**"), with the Debtor authorized to borrow funds up to $480,000.00, pursuant to that certain, among other things, Debtor in Possession Credit (the "**DIP Credit Agreement**") between the Debtor and Hason; (ii) granting security interests and

superpriority claims, and (iii) granting adequate protection, all pursuant to the terms of the proposed Interim Order attached thereto.

87.     I believe that, under the current circumstances, the postpetition financing proposal made by Hason most clearly satisfies the Debtor's financing needs and establishes necessary support at the outset of this case to permit the Debtor time to seek to maximize the value of the estate for the benefit of all creditors.

88.     Before deciding to enter into the DIP Credit Agreement, the Debtor and Hason engaged in arms' length, good faith negotiations, each with separate and independent counsel experienced in matters of finance and bankruptcy law.   I believe that based on the totality of circumstances, the Debtor was unable to obtain proposals for postpetition financing on terms and conditions more favorable to the Debtor's estate than those set forth in the DIP Credit Agreement.

89.     Unless the Debtor is authorized to obtain the financing requested herein, the Debtor faces significant risks that its primary vendors will no longer do business with the Debtor, Employees will have added concern with respect to their job security, and customers may turn to competitors.   Additionally, the new liquidity will allow the Debtor to maintain ordinary and consistent business operations moving forward.   Ultimately, I believe the DIP Facility will provide necessary comfort of the Debtor's ability to maintain business relationships among vendors, suppliers, Employee, and customers, which is essential to the Debtor's continued viability and preservation and maintenance of the going concern value of the Debtor's business.

90.     I believe the Debtor is unable to obtain credit that is not both secured and entitled to what counsel has explained to me as superpriority administrative claim status under the Bankruptcy Code from any other financing source.   Under the Debtor's circumstances, and given

the Debtor's current financial status, I believe that no lender would provide financing to the Debtor other than on a secured and superpriority basis.  The Debtor requested that Fifth Third Bank, its prepetition lender, provide necessary postpetition financing, but Fifth Third Bank declined.  Given the Debtor's economic standing, and in particular, the Debtor's significant liquidity crisis, the Debtor was only able to find postpetition financing arrangements with Hason.  No lender offered financing on terms that, taken as a whole, were better than those provided under the DIP Credit Agreement.  I have been informed by counsel that this satisfies the conditions for 364(c) of the Bankruptcy Code.  Thus, I believe that the financing arrangement proposed under the DIP Credit Agreement represents the best available to the Debtor at this time.

91.     I believe and understand that the terms of the DIP Credit Agreements and Interim Order are fair, just, and reasonable under the circumstances, as ordinary and appropriate for secured financing to debtors in possession, reflect the Debtor's exercise of its prudent business judgment consistent with its fiduciary duties, and are supported by reasonably equivalent value and fair consideration.  The terms and conditions of the DIP Credit Agreement and the Interim Order have been negotiated in good faith and at arms' length by and among the Debtor and Hason, with all parties represented by counsel.  Accordingly, the Debtor believes that any credit extended under the terms of the Interim Order is extended in good faith by Hason as that term is used in section 364(e) of the Bankruptcy Code.

92.     I believe that the Debtor's inability to utilize the funds made available pursuant to the DIP Credit Agreement will immediately create substantial issues with Debtor's ability to continue fabrication operations, create customer dissatisfaction and, ultimately could cause the cessation of its operations.  Additionally, I believe this would result in the value of the Debtor's going concern operations plummeting overnight.  Accordingly, I believe the only way to protect

the value of the prepetition assets to the fullest extent possible is for the Debtor to obtain the debtor in possession financing provided by the DIP Facility.

93.     Therefore, I believe that it is in the exercise of the respective best interest and reasonable business judgment of the Debtor, that the financing to be provided by Hason is the most favorable funding available under the circumstances and addresses the Debtor's immediate necessary financing needs while it reorganizes its business.  I believe that the financing available under the DIP Credit Agreement will enable the Debtor, among other things, to maintain good relationships with the majority of its vendors, provide added confidence to employees and customers and avoid the cessation of its ongoing operations, and maximize the value of its business as a going concern.

**G.     Application for an Interim and Final Order Authorizing the Employment, Retention and Compensation of Frost Brown Todd LLC *nunc pro tunc* as Counsel for the Debtor and Debtor-in-Possession ("FBT Retention Application")**

94.     By the above referenced FBT Retention Application, the Debtor seeks to employ and retain the firm of Frost Brown Todd LLC as its counsel with regard to the filing and prosecution of this chapter 11 case and all related matters, effective as of the Petition Date. Accordingly, the Debtor respectfully requests entry of an order authorizing it to employ and retain Frost Brown Todd LLC as its general bankruptcy counsel to perform the legal services that will be necessary during this chapter 11 case.

95.     Frost Brown Todd LLC is well qualified to represent the Debtor.  In preparing for this case, Frost Brown Todd LLC has become familiar with the Debtor's business affairs and many of the potential legal issues that may arise in connection with these this chapter 11 case. Frost Brown Todd LLC also has knowledge of the Debtor's business, financial affairs and capital structure.  In selecting Frost Brown Todd LLC as its general bankruptcy counsel, the Debtor

considered Frost Brown Todd LLC's knowledge of the Debtor's operations and finances and its expertise and experience in reorganization and bankruptcy law.

96.      I understand that Frost Brown Todd LLC has served as counsel to debtors and creditors in various bankruptcy cases.   In addition, the Frost Brown Todd LLC attorneys responsible for representing the Debtor in matters related to its reorganization are members of Frost Brown Todd LLC's restructuring, reorganization and bankruptcy department, with substantial experience in a wide range of bankruptcy cases.

97.      Frost Brown Todd LLC's depth of experience in business reorganizations and its familiarity with the Debtor makes Frost Brown Todd LLC uniquely qualified to deal effectively with the legal issues that may arise in the context of the Debtor's reorganization.   Therefore, the Debtor believes that Frost Brown Todd LLC is well qualified to serve as its bankruptcy counsel and that retention of Frost Brown Todd LLC is in the best interest of the estate.

98.      I believe the Frost Brown Todd LLC's services are necessary to enable and assist the Debtor in performing its duties as Debtor-in-Possession relating to the day-to-day operations of the company as well as all bankruptcy specific matters.

99.      Accordingly, I respectfully submit that authorizing the Debtor to employ and retain Frost Brown Todd LLC as attorneys for the Debtor in these chapter 11 proceedings is necessary and in the best interest of the Debtor and its estate.

I.      **Application for an Order Authorizing the Employment, Retention and Compensation of Financial Resource Associates, Inc. Through Its Designated Representative Leonard Z. Eppel, *nunc pro tunc* as Chief Restructuring Officer for the Debtor and Debtor-in-Possession ("Eppel Retention Application")**

100.      By the above referenced Financial Resource Associates, Inc. ("**FRA**"), the Debtor seeks to employ and retain FRA as its Chief Restructuring Officer with regard to the filing and

handling of this chapter 11 case and all related matters, including but not limited to the proposed sale of the Debtor's assets and with all authority of a chief executive officer, through FRA's designated representative, Leonard Z. Eppel ("**Eppel**"), and effective as of the Petition Date.

101.    FRA and Eppel are well qualified to represent the Debtor.  In preparing for this case, FRA and Eppel have provided financial consulting services to the Debtor and have become familiar with the Debtor's business affairs and many of the potential issues that may arise in connection with these this chapter 11 case.  FRA and Eppel also have knowledge of the Debtor's business, financial affairs and capital structure.  In selecting FRA through Eppel as its Chief Restructuring Officer, the Debtor considered FRA and Eppel's knowledge of the Debtor's operations and finances and their expertise and experience in reorganization and bankruptcy law.

102.    I understand that FRA and Eppel have served as a financial consultant, chief executive officer, chief financial officer and chief restructuring officer for multiple companies, both in bankruptcy and non-bankruptcy situations.

103.    FRA's and Eppel's depth of experience in business reorganizations and their familiarity with the Debtor makes them uniquely qualified to deal effectively with the legal issues that may arise in the context of the Debtor's bankruptcy case.  Therefore, the Debtor believes that FRA through Eppel is well qualified to serve as its Chief Restructuring Officer and that retention of FRA is in the best interests of the estate.

104.    I believe that FRA's services are necessary to enable and assist the Debtor in performing its duties as Debtor-in-Possession relating to the day-to-day operations of the company as well as all bankruptcy specific matters, such as the proposed sale of the Debtor's business.

105.    Accordingly, I respectfully submit that authorizing the Debtor to employ and retain FRA, through its designated representative Eppel, as Chief Restructuring Officer for the Debtor in this chapter 11 case is necessary and in the best interest of the Debtor and its estate.

### III.    CONCLUSION

101.    In order to preserve and maximize the value of its business, until the Debtor can be sold, the Debtor's immediate goal is to continue business operations in the ordinary course following the commencement of this chapter 11 case. I believe that, if the Court grants the relief requested in each respective First Day Motion, the prospect of achieving these objectives will be substantially enhanced to the benefit of the Debtor's estate, its creditors, and other parties in interest.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my information, knowledge and belief.

Executed this 5th day of June, 2014.

By: /s/ _____
Timothy C. Odom
CEO and Sole Shareholder

0000000.0001531  4825-9062-2235v4